902 F.2d 32
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
William ADAM, Robert L. Aiken, Eugene P. Balda, William
Brown, Don Cunningham, Al Dore, Marie MacKenzie, Stan
McNeff, Jim O'Neill, Cal Shepherd, Tom Smith, William Steel,
Bruno Walczak, and Marjorie Wright, Plaintiffs-Appellants,
v.
ETHYL CORPORATION, Defendant-Appellee.
and
Calvin C. SHEPHERD, Plaintiff-Appellant,
v.
ETHYL CORPORATION, Defendant-Appellee.
 Nos. 88-2154, 88-2158.
 United States Court of Appeals, Sixth Circuit.
 April 26, 1990.
 
 Before KEITH and MILBURN, Circuit Judges, and CONTIE, Senior Circuit Judge.
 PER CURIAM.
 
 
 1
 Discharged employees appeal from the summary judgment dispositions of their actions against their former employer.
 
 I.
 
 2
 Adam, et al. v. Ethyl Corp.
 
 
 3
 Ethyl Corporation (Ethyl), the appellee in both actions, is a large corporation which conducts business worldwide. Ethyl's diverse business interests include petroleum products, plastics, industrial chemicals, pharmaceutical chemicals, and insurance. The Detroit Research Laboratories were part of Ethyl's Research and Development segment headquartered in Baton Rouge, Louisiana.
 
 
 4
 The instant action was filed by sixteen former employees of Ethyl's Detroit Research Laboratories: William Adam, Robert L. Aiken, Eugene P. Balda, William Brown, Ken Christenson, Don Cunningham, Al Dore, Russ Fargo, Marie MacKenzie, Stan McNeff, Jim O'Neill, Cal Shepherd, Tom Smith, William Steel, Bruno Walczak, and Marjorie Wright. The appellants alleged that they were terminated because of their ages, and, alternatively, that they were terminated in violation of implied employment contracts. On October 17, 1985, the district court dismissed the employees' claims under the Age Discrimination in Employment Act (ADEA), under the United States and Michigan Constitutions, and under the common law, as well as their claims for intentional infliction of emotional distress, mental anguish, and punitive damages.
 
 
 5
 The claims of two plaintiffs, Russ Fargo and Ken Christenson, were dismissed by stipulation of the parties. The claims of a third plaintiff, Marie MacKenzie, were dismissed in an order granting Ethyl's motion for summary judgment on June 6, 1986. Because Marie MacKenzie's dismissal was not timely appealed, she is not an appropriate appellant in the instant action. Furthermore, the district court dismissed the breach of contract and pension claims asserted by appellants Stan McNeff and Calvin Shepherd in an order dated June 10, 1986. Therefore, thirteen appellants remain asserting claims for breach of implied employment contracts and for age discrimination under Michigan law.
 
 
 6
 Petroleum Chemicals Research (PCR) and Automotive Research and Applications (ARA) were the two primary components of the Detroit Research Laboratories in the early 1980's. Because PCR was primarily engaged in chemical research, most of its employees were professionals (chemists and chemical engineers) holding advanced degrees. ARA, meanwhile, performed automotive research for the Petroleum Chemicals Division (PCD) of Ethyl. PCD, in effect, funded ARA's automotive research operations. ARA employed engineers (professionals) and technicians (nonprofessionals) who blended fuels, ran climate chambers, performed emissions tests, and ran automotive fleet tests.
 
 
 7
 Much of the Detroit Research Laboratories' research involved the production of lead additives for gasoline, specifically tetraethyl lead (an "anti-knock" additive). The Detroit Research Laboratories flourished for decades until the federal government tightened its regulations regarding lead additives. The Detroit facility, once employing nearly 500 workers at the peak of Ethyl's lead additive business, employed less than 200 by the end of 1982 due to substantial reductions in the production of "anti-knock" products. Ethyl's declining tetraethyl lead production was directly attributable to increasingly severe government regulations.
 
 
 8
 Ethyl's drastic decline in tetraethyl lead production resulted in substantial work force reductions throughout the company including Ethyl's decision to close the Detroit Research Laboratories, the Baton Rouge tetraethyl lead production facility, and a tetraethyl lead production facility in Greece. Much of the work force reduction was accomplished through involuntary layoffs. Between 1982 and 1986 nearly 2100 employees lost their jobs at the Petroleum Chemicals Division, and the closing of the Baton Rouge plant resulted in the loss of over 1500 jobs.
 
 
 9
 The Detroit Research Laboratories' operations were significantly reduced, and ultimately eliminated, due to the declining tetraethyl lead market and PCD's withdrawal of research and development funding. Ethyl Corporation decided to move PCR from Detroit to Baton Rouge to consolidate its operations. Some, but not all, of the PCR professional employees were transferred to Baton Rouge by the summer of 1983. Two of the appellants, Bruno Walczak and Eugene Balda, were among the several PCR chemists who were not offered transfers to Baton Rouge. Walczak transferred to ARA in Detroit (as an experimental fuel coordinator) on December 15, 1982. Balda's employment was terminated on June 30, 1983.
 
 
 10
 Nonprofessional employees, including chemical technicians, were not transferred to Baton Rouge. The appellee claims that it has a long-standing policy of not transferring nonprofessional employees due to significant moving expenses and the ease of hiring locally to fill nonprofessional job vacancies. Furthermore, Ethyl claims that public relations and union considerations favor the hiring of local job applicants.
 
 
 11
 The decision to move PCR from Detroit to Baton Rouge resulted in the elimination of the nonprofessional chemical technician classification in Detroit on December 15, 1982. Eleven chemical technicians were affected by the classification elimination including Stan McNeff and Cal Shepherd who are appellants in this action. Three of the eleven chemical technicians were terminated on December 15, 1982, and the remaining eight were given various job assignments in the Detroit facility including maintenance and security assignments. The three chemical technicians who were terminated on December 15, 1982, were younger, and had fewer years of service with Ethyl, than McNeff and Shepherd.
 
 
 12
 No chemical technicians were hired in Baton Rouge to perform the work previously performed by the Detroit Research Laboratories' chemical technicians. The chemical technicians' responsibilities were now being performed by the PCR professionals, and by lab assistants, in Baton Rouge. The appellees maintain that the Detroit chemical technicians could not have been transferred to Baton Rouge to work as lab assistants because the lab assistants in Baton Rouge were unionized employees represented by the Allied Oil Workers Union who, similarly, faced severe layoffs. Indeed, over seventy-five percent of the Baton Rouge lab assistant work force was laid off between 1982 and 1985. In fact, no one had been hired as a lab assistant in Baton Rouge since 1976.
 
 
 13
 Following PCR's move to Baton Rouge, the Detroit facility housed the Automotive Research and Applications department. In 1984, however, PCD withdrew its future funding of ARA research due to the decline in the tetraethyl lead market. This decision resulted in the closing of the Detroit Research Laboratories. The closing of the Detroit Research Laboratories was announced on April 12, 1984. The facility was subsequently closed, in its entirety, on August 31, 1984. Only eight Detroit Research Laboratories' employees remained following Ethyl's decision to close the Detroit facility. Seven of the eight employees worked in rented space in the Detroit area. The eighth retained employee, a research supervisor, was transferred to St. Louis to continue his fuel additives research with another division of Ethyl. The ages of the eight employees who remained with Ethyl, following the Detroit Research Laboratories closing, are as follows:
 
 
 14
 NAME AGE (as of 8/31/84)
Bill Adams 53
Tom Coffield 62
Shirley Cunningham 57
Geraldine Dunn 57
Cap Hall 69
Denis Lenane 52
John Sunne 34
Art Zeitz 62
NAME AGE (as of 8/31/84)
William Adam 55
Robert L. Aiken 57
Eugene P. Balda 55
William Brown 55
Don Cunningham 57
Al Dore 55
Stan McNeff 55
Jim O'Neill 58
Cal Shepherd 59
Tom Smith 55
William Steel 56
Bruno Walczak 55
Marjorie Wright 54
 
 
 15
 Ethyl filed motions for summary judgment against each of the remaining thirteen plaintiffs following the close of discovery. These motions were argued on November 3, 13, and 17, 1987, before Magistrate Pepe. On April 15, 1988, Magistrate Pepe issued a lengthy, and detailed, report and recommendation granting all of Ethyl's summary judgment motions. Plaintiffs filed objections to the magistrate's report on April 28, 1988. The district court judge, after reviewing the record, issued his order accepting the magistrate's report in its entirety. The district court judge thereupon entered a judgment against the thirteen remaining plaintiffs on October 7, 1988. Plaintiffs timely appealed the district court's order on November 4, 1988. Plaintiffs' appeal was consolidated with Calvin Shepherd's appeal (Shepherd v. Ethyl Corp.).
 
 
 16
 Shepherd v. Ethyl Corp.
 
 
 17
 Calvin Shepherd, one of the appellants in Adam, et al. v. Ethyl Corp., filed a separate action against Ethyl several months after Adam was filed. Ethyl laid off Shepherd, a black man, on August 31, 1984 when the Detroit Research Laboratories officially closed. Shepherd contends that the wages he was paid as a chemical technician (a position that he held from 1962 until December 15, 1982) were racially discriminatory. Shepherd further argues that his job assignments, following Ethyl's decision to eliminate all chemical technician positions in Detroit, were racially discriminatory. Shepherd also asserts a breach of contract claim which merely restates the two aforementioned race claims. Shepherd stipulated to the dismissal of an intentional infliction of emotional distress claim against Ethyl.
 
 
 18
 Calvin Shepherd was hired by Ethyl on June 29, 1953 as a handyman and lab attendant in PCR. Appellant became a chemical technician in PCR in 1962, and remained in that position until December 15, 1982, the date that Ethyl eliminated the position. Eleven chemical technicians were employed in PCR when the position was eliminated. Three of the eleven chemical technicians (Don Amidon, Jerome Davis, and Chuck Frame) were terminated on December 15, 1982. These three men were the least senior chemical technicians. Furthermore, Davis, who is black, had fewer years of service than any of his co-workers. Amidon and Frame are both white.
 
 
 19
 The eight remaining chemical technicians were given new assignments. Only two of the eight (Ken Christenson and Russ Fargo) received other technical assignments. The other six chemical technicians were assigned to non-technician jobs. Three men, including the appellant, went to Maintenance. One man served as a security guard, one worked in the Chemical Stockroom, and one man went to Shipping. All these men, with the exception of Shepherd, were white.
 
 
 20
 Subsequently, Shepherd was moved from Maintenance for three weeks to work as a technician on a special pilot plant run. Shepherd returned to Maintenance for a limited time before becoming a security guard, the position that he held until the Detroit facility closed on August 31, 1984. Appellant admits that none of these moves required him to take a cut in pay. In fact, Shepherd received a pay increase while working in Maintenance.
 
 
 21
 Shepherd claims that he was treated differently than white employees in terms of the job assignments he received following the elimination of the chemical technician classification. Shepherd's allegation focuses specifically on one white co-worker, Stan McNeff, and the assignments he received after the chemical technician classification was eliminated. Shepherd, however, admits that McNeff was similarly assigned to Security before becoming an engineering technician, a job that McNeff, unlike Shepherd, had previously held. McNeff, like Shepherd, lost his job when the Detroit facility closed.
 
 
 22
 Shepherd's wage discrimination claim similarly involved Stan McNeff. Shepherd's comparison to McNeff concerned the period when both men were employed as chemical technicians. Though Ethyl admitted that McNeff earned more than the appellant, Shepherd admitted that he had no knowledge of McNeff's skills, experience, or performance, factors considered by Ethyl when determining salaries. Furthermore, the appellant admitted that McNeff had worked for Ethyl as a technician nine years longer than he had. Shepherd acknowledges that he did not suffer any wage discrimination when working in Maintenance or as a security guard.
 
 
 23
 Ethyl filed a motion for summary judgment on Shepherd's race and related contract claim following discovery. Magistrate Pepe, after hearing oral arguments on November 10, 1987, issued a report and recommendation dated April 29, 1988, granting Ethyl's summary judgment motion. Shepherd filed objections to the magistrate's report and recommendation on May 6, 1988. Nevertheless, the district court judge accepted the magistrate's report and entered summary judgment against Shepherd. Shepherd timely filed a notice of appeal.
 
 II.
 Summary Judgment
 
 24
 Summary judgment is appropriate where "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56. A district court's grant of summary judgment is reviewed de novo. Pinney Dock & Transp. Co. v. Pennsylvania Cent. Corp., 838 F.2d 1445, 1472 (6th Cir.), cert. denied, 109 S.Ct. 196 (1988). In its review, this court must view all facts and inferences drawn therefrom in the light most favorable to the nonmoving party. 60 Ivy St. Corp. v. Alexander, 822 F.2d 1432, 1435 (6th Cir.1987).
 
 
 25
 The moving party has the burden of conclusively showing that no genuine issue of material fact exists. Id. Yet in the face of a summary judgment motion, the nonmoving party cannot rest on its pleadings, but must come forward with some probative evidence to support its claim. Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986); 60 Ivy St. Corp., 822 F.2d at 1435.
 
 
 26
 "By its very terms, this standard provides that the mere existence of some alleged factual dispute betweeen the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986) (emphasis in original). The dispute must be genuine and the facts must be such that if they were proven at trial, a reasonable jury could return a verdict for the nonmoving party. 60 Ivy St. Corp., 822 F.2d at 1435. If the disputed evidence "is merely colorable or is not significantly probative, summary judgment may be granted." Anderson, 477 U.S. at 249-50 (citations omitted).
 
 
 27
 Adam, et al. v. Ethyl Corp.
 
 1. Implied Employment Contract Claims
 
 28
 The appellants, relying on Toussaint v. Blue Cross & Blue Shield of Michigan, 408 Mich. 579 (1980), argue that they had implied contracts with the appellee not to be discharged except for just cause. In Toussaint, the Michigan Supreme Court held:
 
 
 29
 (1) a provision of an employment contract providing that an employee shall not be discharged except for cause is legally enforceable although the contract is not for a definite term--the term is "indefinite," and
 
 
 30
 (2) such a provision may become part of the contract either by express agreement, oral or written, or as a result of an employee's legitimate expectations grounded in an employer's policy statements.
 
 
 31
 .............................................................
 
 
 32
 ...................
 
 
 33
 * * *
 
 
 34
 (4) A jury could also find for Toussaint based on legitimate expectations grounded in his employer's written policy statements set forth in the manual of personnel policies.
 
 
 35
 Id. at 598-99. The Michigan Supreme Court later restated its Toussaint holding in Valentine v. General Am. Credit, Inc., 420 Mich. 256 (1984):
 
 
 36
 In Toussaint, this Court held that an employment contract providing that an employee would not be terminated except for cause was enforceable although no definite term of employment was stated.
 
 
 37
 Toussaint makes employment contracts which provide that an employee will not be dismissed except for cause enforceable in the same manner as other contracts. It did not recognize employment as a fundamental right or create a new "special" right. The only right held in Toussaint to be enforceable was the right that arose out of the promise not to terminate except for cause.
 
 
 38
 Employers and employees remain free to provide, or not to provide, for job security. Absent a contractual provision for job security, either the employer or the employee may ordinarily terminate an employment contract at any time for any, or no, reason. The obligation which gave rise to this action is based on the agreement of the parties; it is not an obligation imposed on the employer by law. This is an action for breach of contract and not a tort action.
 
 
 39
 Id. at 258-59 (citation omitted) (footnotes omitted).
 
 
 40
 The appellants in the instant action argue that their continued employment with Ethyl was protected by implied employment contracts. To support their contention, the appellants contend that a speech given by an Ethyl supervisor, regarding the continued existence of the Detroit Research Laboratories, impliedly guaranteed continued employment to the appellants. The appellants further argue that miscellaneous statements made by Ethyl management in the 1950's and 1960's regarding continued employment at Ethyl necessarily created Toussaint implied employment contracts. This court need not address these arguments, however, because the Sixth Circuit recently held that Toussaint "just cause" discharge contracts are not applicable to force reductions mandated by economic necessity. See Boynton v. TRW, Inc., 858 F.2d 1178, 1184 (6th Cir.1988) (en banc).
 
 
 41
 The appellants in the instant action were terminated by Ethyl pursuant to a staff reduction following the decision to close the Detroit Research Laboratories due to economic necessity. This court addressed, and resolved, the economic necessity issue recently:
 
 
 42
 Boynton's claim that he was discharged without cause is indistinguishable from the claims held barred in Friske and Bhogaonker. There is no dispute that TRW's decision to lay off Boynton was born out of economic necessity, a factor outside of Boynton's or TRW's control. Based on the Michigan cases previously cited, we are simply unable to conclude that Boynton's claim falls within the ambit of a Toussaint wrongful discharge claim. We find virtually no support for Boynton's claim that a "just cause employment contract" guarantees permanent employment regardless of changes in economic conditions, absent specific language to that effect. Further, while "[t]he jury is always permitted to determine the employer's true reason for discharging the employee," we find no support for the proposition that the soundness of a management decision to effect a reduction in force solely by reason of adverse economic circumstances is also subject to jury review. Accordingly, we hold that to the extent Boynton's claim challenges the "justness" of TRW's economically motivated decision to eliminate his sales position, a position left unfilled, TRW is entitled to judgment as a matter of law.
 
 
 43
 Boynton, 858 F.2d at 1184 (citations omitted). See also Friske v. Jasinski Builders, Inc., 156 Mich.App. 468, 472 (1986) ("[A]s a matter of law, plaintiff's discharge for economic reasons, as determined by and within the complete discretion of the board of directors of defendant corporation, constitutes termination for sufficient cause. To hold otherwise would impose an unworkable economic burden upon employers to stay in business to the point of bankruptcy in order to satisfy employment contracts and related agreements terminable only for good or sufficient cause.")
 
 
 44
 Therefore, even if the appellants prove that they were protected under "just cause" implied employment contracts, the appellee did not breach the contracts by laying off the appellants following the decision to close the Detroit Research Laboratories. Appellants acknowledge that they were not promised continued employment if the Detroit laboratories were to close. The appellants, however, argue that the appellee could have continued to operate the Detroit facilities profitably. This argument is without merit. As the Michigan Court of Appeals held in Friske, an employer has "complete discretion" when discharging employees for economic reasons. Id. Furthermore, the facts support the appellee's contention that the government's newly-enacted regulations severely curtailed the need for further tetraethyl lead research and production, thereby rendering the Detroit Research Laboratories economically undesirable.
 
 
 45
 Appellants presented no evidence suggesting that Ethyl's reduction in force was not an economically proper business decision. Ethyl's decision to close the Detroit Research Laboratories constituted "just cause" employment terminations as a matter of law. Because there are no material issues of fact to be decided by a jury, the appellee is entitled to summary judgment, as to all appellants, on their Toussaint implied contract claims.
 
 2. Age Discrimination Claims
 
 46
 The appellants argue that the appellee discharged them due to, in part, their ages. Appellants' federal claims under the Age Discrimination in Employment Act were dismissed. The remaining age discrimination claims were brought under the Elliott-Larsen Civil Rights Act, Mich.Comp.Laws Ann. Sec. 37.2101 et seq. (1979).
 
 
 47
 The Michigan Supreme Court has held: "To establish a prima facie case of age discrimination when an employer lays off employees for economic reasons, the courts have required the employee to present sufficient evidence on the ultimate question--whether age was a determining factor in the decision to discharge the older protected employee." Matras v. Amoco Oil Co., 424 Mich. 675, 684 (1986). "Evidence that a competent older employee was terminated, and a younger employee was retained, is insufficient standing alone to establish a prima facie case when the employer reduces his workforce because of economic necessity." Dabrowski v. Warner-Lambert Co., 815 F.2d 1076, 1079 (6th Cir.1987) (quoting Matras, 424 Mich. at 684). The Sixth Circuit in Dabrowski concluded:
 
 
 48
 The recent decision of the Michigan Supreme Court in Matras teaches that where a company is in the process of restructuring its work force because of economic problems, an unsuccessful older employee who brings suit for age discrimination must show more than a mere age difference between himself and those employees who better weathered the storm.
 
 
 49
 Dabrowski, 815 F.2d at 1080.
 
 
 50
 The magistrate in the instant action concluded that the appellants had failed to present any evidence supporting their age discrimination claims. The magistrate also rejected the appellants' assertion that Ethyl's failure to transfer them to facilities throughout the country evidenced age discrimination. The district court accepted the magistrate's findings. We similarly accept the magistrate's findings.
 
 
 51
 Though all the appellants were between 55 and 59 years old when they were discharged, seven of the eight employees retained at the Detroit facility were in their fifties and sixties. In fact, the average age of the eight retained employees (55.75 years) is nearly identical to the average age of the plaintiff-appellants (55.85 years). This statistic strongly suggests that age was not a factor in the appellee's decision to terminate the appellants' employment.
 
 
 52
 Furthermore, the appellants offered no evidence to support their assertion that younger individuals replaced them following their terminations. In fact, the evidence supports the finding that many Ethyl employees in Baton Rouge, and elsewhere, lost their jobs following the Detroit facility's closing. Appellants' reliance on unsubstantiated conclusory statements regarding age bias cannot, without corroborating objective evidence, preclude summary judgment.
 
 
 53
 Similarly, appellants' contention that Ethyl's failure to transfer them evidenced age discrimination is without merit. Ethyl's clearly established policy was to offer transfers to professional employees only. Furthermore, the appellants did not produce evidence that they were qualified for any available positions. "Where an employer reduces his workforce for economic reasons, it incurs no duty to transfer an employee to another position within the company." Ridenour v. Lawson Co., 791 F.2d 52, 57 (6th Cir.1986).
 
 
 54
 Because the appellants failed to demonstrate that their ages were determining factors in Ethyl's termination decisions, no material issue of fact exists for a jury to decide. Appellee is therefore entitled to summary judgment on all age discrimination claims.[1] The district court's summary judgment disposition is therefore AFFIRMED.
 
 
 55
 Shepherd v. Ethyl Corp.
 
 1. Elliott-Larsen Wage Discrimination Claim
 
 56
 Calvin C. Shepherd, a black man, argues that his salary as a chemical technician was below that being paid to Ethyl's similarly situated white employees. Shepherd further contends that his race was a factor in the job assignments he received at Ethyl during the closing of the Detroit Research Laboratories. Appellant asserted claims for breach of an implied employment contract and for race discrimination.
 
 
 57
 Ethyl argued, and the magistrate and district court agreed, that Shepherd's wage claim was time-barred. Shepherd's complaint was filed on February 24, 1986, more than two months after the expiration of the applicable three-year statute of limitations for actions brought under Michigan's Elliott-Larsen Civil Rights Act because the action pertained to periods prior to December 15, 1982 (when Shepherd worked as a chemical technician). See Mich.Comp.Laws Ann. Sec. 600.5805(8); Mair v. Consumers Power Co., 419 Mich. 74, 77-78 (1984). The appellant specifically stated that he was not extending his wage disparity claim to his maintenance and security guard positions that he assumed after the chemical technician positions were eliminated in December, 1982. Shepherd, however, argues that the three-year limitations period should be tolled because he did not discover, and could not have discovered, the alleged wage discrimination until late 1985.
 
 
 58
 A statute of limitations period begins to run when a claimant discovers, or in the exercise of reasonable diligence should have discovered, the acts constituting the alleged violation. The burden is on the claimant to plead specific facts indicating why the limitations period should be tolled. See Auslender v. Energy Management Corp., 832 F.2d 354, 356 (6th Cir.1987). The appellant's ignorance of his cause of action does not, by itself, satisfy the requirements of due diligence and will not toll the statute of limitations. See Campbell v. Upjohn Co., 676 F.2d 1122, 1127 (6th Cir.1982). Though Shepherd suggested that information regarding disparate wage rates had been concealed from him, he did not produce any evidence regarding such concealment. Furthermore, Shepherd's contention is contradicted by his own statements that he learned of the alleged wage disparities during the 1950's, or, alternatively, at Stan McNeff's deposition in 1985, well before the statute of limitations had expired.
 
 
 59
 Because Shepherd has failed to justify tolling the statute of limitations, his wage discrimination claim brought under the Elliott-Larsen Civil Rights Act is time barred. We therefore affirm the district court's order which granted summary judgment to Ethyl on Shepherd's Elliott-Larsen wage discrimination claim.[2]
 
 
 60
 2. Implied Contract--Discriminatory Wage Claim
 
 
 61
 Shepherd argues that Ethyl breached an implied contract by allegedly paying him racially discriminatory wages. Though the statute of limitations does not bar appellant's implied contract claim, see Mich.Comp.Ann.Laws Sec. 600.5807(8), the magistrate and district court found that Shepherd had presented "no evidence whatsoever " (emphasis in original) to prove that an implied contract existed between Shepherd and Ethyl. We agree. Alternatively, the magistrate held: "even assuming arguendo the existence of such a contract, plaintiff has failed to state a prima facie case of wage discrimination." Because no implied contract exists, this court need not address the substantive "prima facie case" determination. The appellee was therefore entitled to summary judgment on the implied contract claim.
 
 
 62
 3. Racially Motivated Demotion and Discharge Claim
 
 
 63
 Shepherd argues that his janitor and security guard job assignments were racially motivated and discriminatory. Shepherd further contends that his discharge on August 31, 1984, was racially motivated. Appellant bases these claims on the Elliott-Larsen Civil Rights Act and on an implied employment contract theory.
 
 
 64
 Shepherd submitted no evidence to support his contention that his job assignments were racially administered. The uncontradicted evidence indicates that two white men were sent with the appellant to Maintenance. Furthermore, two other white men were later assigned to perform janitorial duties after Shepherd became a security guard.
 
 
 65
 Similarly, Shepherd has not rebutted the appellee's "economic necessity" rationale for closing the Detroit Research Laboratories and terminating his employment. Appellant was discharged with numerous other nonprofessional employees, most of whom were white. Factually unsupported allegations of discrimination are insufficient to withstand a motion for summary judgment. See Jones v. Lewis, 874 F.2d 1125, 1128 (6th Cir.1989); see also Clark v. Uniroyal Corp., 119 Mich.App. 820, 825-27 (1982) (summary judgment is appropriate when a plaintiff cannot factually establish a prima facie racial discrimination claim).
 
 
 66
 Appellant's racial discrimination allegations are substantively without merit. The district court's grant of summary judgment to Ethyl Corporation is therefore AFFIRMED.[3]
 
 
 
 [1]
 This determination is consistent with this court's recent decision in Barnes v. GenCorp Inc., 896 F.2d 1457 (6th Cir.1990)
 
 
 [2]
 Appellee, in the alternative, argues the merits of Shepherd's Elliott-Larsen wage claim noting that Shepherd failed to establish a prima facie case of wage discrimination. We need not address this contention because the statute of limitations bars Shepherd's Elliott-Larsen wage discrimination claim
 
 
 [3]
 Ethyl Corporation moved for sanctions (pursuant to Fed.R.App.P. 38) against the appellants' attorney during oral arguments. Because we do not find sanctions warranted, the appellee's motion is denied